No. 24,015.

JOHN T. CALLAHAN, *Appellee,* v. FIRST NATIONAL BANK OF WETMORE, *Appellant,* (W. E. STEWART LAND COMPANY AND JOSEPH W. PFRANG, *Appellees*).

SYLLABUS BY THE COURT.

1. Where a bank purchases promissory notes and the purchase money is deposited in the bank and held there pending procuring security on the notes, and while the money is still on such deposit, the bank obtains knowledge of infirmities in the notes, *held,* the bank has not paid the amount of the purchase price of the notes, within the meaning of section 6581 of the General Statutes of 1915.

2. SAME. The evidence examined and, *held* to support a finding that the transferee of promissory notes had notice of the infirmities of the instruments, within the meaning of section 6583 of the General Statutes of 1915 at the time it parted with the purchase price thereof.

Appeal from Nemaha district court; WILLIAM I. STUART, judge. Opinion filed June 9, 1923. Affirmed.

*T. A. Moxcey,* of Atchison, and *Edgar W. Campbell,* of Topeka, for the appellant.

*A. E. Crane,* and *R. F. Hayden,* both of Topeka, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is a suit to rescind a contract for the purchase of real property for fraud and to cancel the contract and certain notes and other instruments given by plaintiff in connection with such purchase, two of which notes were held by the First National Bank of Wetmore. There was a trial to the court, findings and judgment for plaintiff, and the bank appeals.

John T. Callahan was a resident of Nemaha county, Kan., and had sold his farm there to one Joseph W. Pfrang. The papers for this transaction were in escrow at the First National Bank at Wetmore, where Pfrang was to make some additional payments on March 1, 1919. Callahan accompanied one of the excursions of the W. E. Stewart Land Company to western Texas and on November 4, 1918, signed a contract to purchase thirty acres of land at $300 per acre, paid $500 cash, executed two notes for $2,000 each, due March 1, 1919, and was to secure the balance by a vendor's lien upon the land. Thereafter, and about November 16, 1918, that contract was modified, by which Callahan took twenty acres. of land at another place, but at the same price per acre. The payment made and the notes then executed were to apply upon the second contract. To secure the payment of the two $2,000 notes, Callahan on November 16, 1918, wrote a letter to Joseph W. Pfrang—spoken of in the case as an order, by which he authorized Pfrang to pay to the W. E. Stewart Land Company or its order, out of the moneys coming to Callahan from the sale of his farm to Pfrang, the two $2,000 notes above mentioned when they should become due March 1, 1919. Soon after these notes were executed, November 4, Van-Over, an agent of the Stewart Land Company, went to Wetmore, in Nemaha county, the home of Callahan, and undertook to sell the two $2,000 notes. At one bank he offered them at a discount of $1,000, to be indorsed without recourse. That bank declined to buy them. He also offered them to the First National Bank at Wetmore, and was advised that the bank would not care to buy them unless they were secured by an order upon Pfrang to pay the money. After the change was made in the contract on November 16, and the letter from Callahan to Pfrang—spoken of as an order, had been secured, Rasmus, who had formerly lived at Wetmore, but then living at Atchison, and who had gone to Texas on two excursions with the Stewart Land Company, had a talk with VanOver, in

which VanOver told him Callahan had made a bad trade when he switched contracts. Rasmus talked with VanOver about handling some of the lands or notes for the Stewart Land Company to make some money, and VanOver spoke of the Callahan notes as being notes which could be handled so as to make money out of them. Rasmus was well acquainted with Edgar W. Campbell, an attorney at Wetmore, and the son-in-law of the cashier and assistant cashier of the First National Bank at Wetmore. Rasmus called Campbell by long-distance telephone and located him at Atchison and talked with him about selling the Callahan notes to the appellant bank, and Campbell told him he thought they could sell them if they had this order from Pfrang. The notes were indorsed by the W. E. Stewart Land Company without recourse, and Rasmus took them to Atchison, and delivered them to Campbell. Campbell took the notes to Wetmore and on November 21, sold them to the First National Bank at Wetmore, and in payment therefor, the bank issued to Campbell a cashier's check for $3,940. This cashier's check was deposited by Campbell in the First National Bank at Wetmore, together with other deposits, on November 23. There is evidence that Rasmus sent his check to the Stewart Land Company for the notes on November 23. The amount he remitted was $3,840. Campbell, however, retained the money in the First National Bank at Wetmore, or the bank had him retain it there, until they could get Pfrang's signature of acceptance or approval upon the letter or order written by Callahan to Pfrang dated November 16. In the meantime, Callahan, who was still in Texas, wrote Pfrang on December 4, in which he advised Pfrang about the notes mentioned in this order on him and in the letter stated: "I thought I was cheated out of part of my money at first, but I am not. I got value received." This letter was shown, or the contents of it reported, to Campbell at the time Campbell got Pfrang's signature on Callahan's order, which was December 7, and on that date Campbell sent his check to Rasmus for the notes, the amount sent being $3,880. This check, however, was not presented to the First National Bank of Wetmore until December 11. In the meantime Callahan, who was still in Texas, had other evidence that he had been defrauded, and on December 9 he wired Pfrang: "Am leaving to-day for home. Don't sign my interest to no one. If you have done so wire me Mercedes." This telegram was received by Pfrang either the 9th or 10th of December, and he immediately took it to the First National

Bank at Wetmore, and showed it to Mrs. Achten, the assistant cashier. She is the official of the bank who had handled all matters for the bank in connection with the purchase of these notes. On being shown the telegram by Pfrang, Mrs. Achten said that was why they wanted the order, because they were afraid Callahan would back out. There is evidence to the effect that Campbell, after receiving the notes from Rasmus, and either before, or after he sold them to the bank, offered them for sale to other parties at Wetmore whom he thought had money to purchase notes, and to at least one person offered to sell them at a discount of $400.

In this suit plaintiff's petition alleged fraud on the part of the W. E. Stewart Land Company which induced the contract for the purchase of the land and execution of the notes and order on Pfrang, and asked that the contract be set aside and the notes and order cancelled and surrendered. The land company answered by a general denial. The First National Bank of Wetmore answered by a general denial and by a cross petition in which it set up the two $2,000 notes and alleged that it had purchased the notes for value before due, without knowledge or notice of any infirmities, and that it held them in due course. Pfrang admitted he owed Callahan upon his contract, and paid the money into court, to be disposed of as the court might direct. Upon the trial the court found there was fraud which entitled the plaintiff to rescind, and entered judgment setting aside the contract and for the cancellation of the notes given by Callahan and his order given to Pfrang. As to the connection of the First National Bank with the matter, the court made the following finding:

"The court further finds for the plaintiff and against the defendant, The First National Bank of Wetmore, Kansas, and that on or about the 19th day of November, 1918, the defendant, The First National Bank of Wetmore purchased from the defendant, the W. E. Stewart Land Company, the two Two Thousand Dollar notes mentioned in the pleadings and so purchased the same through Edgar W. Campbell, agent for said W. E. Stewart Land Company, to whom it paid on said date the sum of $3,940, by check, and so purchased the same before the maturity of said notes, in due course, and without notice of any infirmity thereof, which sum was deposited to the credit of said Edgar W. Campbell in said First National Bank of Wetmore, Kansas, and thereafter on or about the 9th day of December, 1918, said First National Bank of Wetmore was shown a telegram from the plaintiff Callahan to the defendant Pfrang, shown in the evidence, and thereon in connection with all the other circumstances within its knowledge as shown by the evidence, had notice of the infirmity of said notes, at which the said Edgar W. Campbell

Callahan v. Bank.

still had to his credit in said First National Bank of Wetmore the sale proceeds of said notes."

The bank alone appeals and concedes that the evidence showed fraud in the inception of the notes, which placed upon it the burden of proof that it was a holder of the notes in due course. (Gen. Stat. 1915, § 6586.)  The bank contends, however, first, that the evidence shows that it purchased the notes for value before maturity, without notice of any infirmity; that it had parted with the purchase price of the notes before Callahan's telegram of December 9, was brought to its attention, within the meaning of section 6581 of the General Statutes of 1915, and, second, even if that is not true, that the telegram itself did not impart actual knowledge of the infirmity or defect, or knowledge of such facts that the bank's action in taking the instruments amounted to bad faith, within the meaning of section 6583 of the General Statutes of 1915.

As to the first question: Had the bank parted with the purchase price of these notes at the time it was advised of Callahan's telegram of December 9?  Section 6581 of the General Statutes of 1915 reads as follows:

"Where the transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him."

It has been repeatedly held that where a bank buys a note and pays for it by giving credit on its bank books to the person from whom the note was purchased, which credit remains there, or a portion of it, until after the bank has notice of the infirmity, that such credit does not constitute payment which will make the bank a holder in due course.  Much is said in the briefs pointing out the distinctions on this subject, and also discussing the matter of whether checks drawn upon an account are presumed to be upon the earliest deposit.  These arguments have no bearing in this case for the reason that by the testimony of Campbell it was shown that this money was kept in the bank purposely until the bank could get the signature of Pfrang upon Callahan's letter or order of November 16.  This was not obtained until December 7.  So up until December 7, at any rate, this money was purposely held in the bank.  Of course, there would be no purpose in holding it in the bank if it were not held in such a way that the bank could have protected itself by declining to hold

the notes and retaining the money. This evidence as to why the money was retained in the bank makes it unnecessary for us to discuss the effect of the bank having given a cashier's check, which was later deposited in the bank in payment of the notes, and also makes it unnecessary to consider what deposits were first drawn out by checks given prior to that time by Campbell. The amount of this deposit was in Campbell's account all of the time and according to his own testimony, was retained there so that the bank could have it in the event anything went wrong about procuring the signature of Pfrang upon the Callahan order. So we have no trouble getting to the point that this money was still held in the bank and in such a way that it could protect itself upon these notes as late as December 7. So far as the bank is concerned, there was no change in that situation on December 10, when, in fact, Callahan's telegram to Pfrang of December 9, was shown to the cashier of the bank. The bank still had every dollar of the money on December 10, and was at that time in a position to protect itself on the notes.

As to the second complaint, section 6583 of the General Statutes of 1915 reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Appellant contends that the court's finding as to the bank that it purchased the notes on or about November 19, and "paid on said date the sum of $3,940 by check, and so purchased the same before the maturity of said notes in due course, and without notice of any infirmity thereof," is a finding favorable to the bank that it had no notice of any infirmity in the note at that time, and that the only notice which the bank received after that date, and before the money which it paid for the notes left the bank on December 11, was Callahan's telegram of December 9, to Pfrang, which Pfrang brought to the bank and showed to its assistant cashier on December 10. And appellant contends that this telegram did not convey knowledge of "the infirmity or defect" which Callahan then knew of, which at that time was that the W. E. Stewart Land Company did not have any title to the land it had contracted to sell Callahan. And defendant further contends that the telegram did not convey knowledge of such facts that the action of the bank in taking the notes amounted to bad faith. But this was not quite all the information

the bank had on the matter between those dates. Pfrang had received a letter from Callahan dated December 4, in which Callahan spoke of possible fraud in connection with the matter—that is, he said he had thought that he had been "cheated out of part of my money," but at the time he wrote the letter he was satisfied he had not been, and that he was getting value received. That being followed in a very few days by the telegram to Pfrang above quoted, would naturally lead one to think that the assurance on the question of fraud, which Callahan had expressed in his letter of December 4, was not well founded. In this telegram he peremptorily tells Pfrang not to sign any papers, if he has done so to wire him at Mercedes; that he was leaving that night and coming home. The very wording and nature of the telegram indicated that Callahan had discovered something which would justify him in revoking the letter or order to Pfrang of November 16, and that he was coming immediately to explain fully and give the matter his personal attention. The court finds that this telegram, when taken in connection with all the other circumstances within the knowledge of the bank as shown by the evidence, gave notice to the bank of the infirmity of the notes. Now, what are some of the other circumstances? In a few days after the notes were signed by Callahan under his first contract, November 4, an agent of the Stewart Land Company was at Wetmore trying to sell the notes without recourse, and the assistant cashier of this bank testified that she knew that this company always sold its notes without recourse, which indicated a knowledge on her part of the method of the land company in handling notes. These notes were offered to another bank at a twenty-five per cent discount. They were offered for sale to this bank, whether at a discount or not is not shown, but this bank declined to buy them in their then condition, but suggested that it might buy them if they were secured by an order on Pfrang. When Rasmus turned these notes over to Campbell to sell to the bank he knew that Callahan had been defrauded in the exchange of contracts for the tracts of land, and knew that the Callahan notes were notes that could be handled in a way to make money out of them. How much of this information he imparted to Campbell, and how much Campbell imparted to the assistant cashier of the bank is not shown, but it is shown that Campbell attempted to sell these identical notes to other parties at Wetmore, and that he offered to take a discount of $400 on them, and at that time they were to be secured by the Pfrang

order. One is almost forced to believe that this offer was made after the supposed sale of these notes to the bank, for Campbell's testimony discloses that he received the notes from Rasmus at Atchison, one evening and that he negotiated them to the bank the next morning. It is also clear that the officials of the bank had some reason, before the telegram of December 9, was received, to believe that Callahan might back out. At any rate, the trial court believed and found that Callahan's telegram of December 9, to Pfrang, and which was shown to the cashier of the bank on December 10, in connection with all the other circumstances within the knowledge of the bank as shown by the evidence, was sufficient to give the bank notice of the infirmity of the notes and we cannot say that the finding of the court upon this matter is not supported by ample evidence.

Some other questions are discussed in the briefs, but they are incidental to the two above mentioned. There is no error in the trial court and its judgment is affirmed.